**ROCHE DIAGNOSTICS CORPORATION,**
Plaintiff,

v.

**SELFCARE INC d/b/a Inverness Medical Technology Inc., Inverness Medical Inc., Can–Am Care Corporation, Inverness Medical Limited, a UK Corporation, Bayer Corporation, Defendants.**

No. IP 00–1103–C–M/S.

United States District Court,
S.D. Indiana,
Indianapolis Division.

Nov. 26, 2002.

Vacated in Part on Grant of Rehearing
Jan. 10, 2003.

Donald Knebel, Barnes & Thornburg, Indianapolis, IN, for Plaintiff.

Daniel L. Boots, Bingham McHale LLP, Indianapolis, IN, Peter B. Ellis, Foley Hoag LLP, Boston, MA, Theresa M. Gillis, Jones Day Reavis & Pogue, New York City, Linda Pence, Sommer & Barnard, Indianapolis, IN, for Defendants.

## ORDER ON SUMMARY JUDGMENT MOTIONS

McKINNEY, Chief Judge.

This cause is now before the Court on the defendant's, Bayer Corporation ("Bayer"), motion for summary judgment of non-infringement of the plaintiff's, Roche Diagnostics Corporation ("Roche"), patent, U.S. Patent Reissue No. 36,268 ("'268 patent"). Bayer argues that summary judgment is appropriate because Roche has no data to support a finding that Bayer's accused devices infringe the "substantially to completion" and the "buffer" limitations of the '268 patent claims.

In addition, Roche has moved for summary judgment on Bayer's defense of patent invalidity. Roche argues that Bayer's defense of anticipation fails because Bayer fails to cite any one prior art reference that contains every element of the asserted claims. Similarly, Roche avers that Bayer's defense of obviousness fails because Bayer has failed to identify clear and convincing evidence that one or more references would have suggested to one of ordinary skill in the art to combine the teachings therein.

The parties have fully briefed their motions and the Court is duly advised. For the foregoing reasons the Court **DENIES** Bayer's motion for summary judgment of non-infringement and **GRANTS in part and DENIES in part** Roche's motion for summary judgment on Bayer's defense of invalidity.

## I. FACTUAL & PROCEDURAL BACKGROUND

### A. THE '268 PATENT

The Patent & Trademark Office ("PTO") issued the '268 patent on August 17, 1999, to Neil J. Szuminsky ("Szuminsky"), Joseph Jordan ("Jordan"), Paul A. Pottgen, and Jonathan L. Talbott ("Talbott") (collectively, the "inventors"). At that time, the patent was assigned to Boehringer Mannheim Corporation ("BMC"), predecessor in interest to the plaintiff, Roche. The '268 patent matured from a continuation of application serial number 08/1776,-863, filed December 30, 1993, that was abandoned, and was a reissue of application serial number 07/745,544, filed August 15, 1991, which matured into U.S. Patent No. 5,108, 564 ("'564 patent"). The '564 patent matured from a division of application serial number 07/322,598, filed March 13, 1989, which was a continuation-in-part of an earlier filed application serial number 07/168,295, filed March 15, 1988, now abandoned.

The '268 patented invention includes the method for using a disposable electroanalytical cell to quantitatively determine the amount of biologically significant compounds, such as glucose, from body fluids. '268 Patent, Abstract; *id.* col. 1, *ll.* 18–25. The invention was designed to permit both physician and patient self-testing of such compounds with greater reliability than either the colorimetric or enzymatic amperometry methods that existed at the time of the invention. *Id.* col. 2, *ll.* 40–65. Be-

cause the accused devices in this case quantify the amount of β–D glucose in a sample, the Court will primarily refer to glucose as the analyte at issue.

Generally, the '268 patent teaches that a sample of blood is placed in a cell or test strip that contains reagents. The sample reacts with the reagents during an "incubation" period. Once the incubation period is complete, a meter is used to measure the current through the cell. The current is then correlated to the amount of glucose or analyte in the cell.

Roche asserts that the accused devices infringe claims 1–6, 12–18, 20–29, 44–46, and 48 of the '268 patent. However, Bayer focuses its motion for summary judgment on the independent claims and elements therein. Specifically, the independent claims at issue read:

1. A method of measuring the amount of a selected compound in body fluids comprising,

 a) providing a measuring cell having at least a first and second electrode and said cell containing an oxidant and a buffer,

 b) placing a sample of fluid to be tested in said cell,

 c) reconstituting said oxidant and buffer with said sample fluid to generate a predetermined reaction,

 d) allowing said reaction to proceed substantially to completion,

 e) applying a potential across said electrodes and sample, and

 f) measuring the resulting Cottrell current to determine the concentration of said selected compound present in said sample.

\* \* \* \* \* \*

12. A method of measuring the amount of an analyte in a blood sample, comprising:

 a) adding the blood sample to an electrochemical cell that includes an electron transfer agent that will react in a reaction involving the analyte, thereby forming a detectable species;

 b) incubating the reaction involving analyte and electron transfer agent in an open circuit until the reaction has substantially completed;

 c) applying a sufficient potential difference between the electrodes of the electrochemical cell, after the incubation step, to readily transfer at least one electron between the detectable species and one of the electrodes, thereby resulting in a Cottrell current;

 d) measuring the Cottrell current; and

 e) correlating the measured Cottrell current to the amount of analyte in the blood sample.

\* \* \* \* \* \*

43. A method for measuring the amount of a selected compound in a blood sample, comprising:

providing a measuring cell having at least first and second electrodes for contact with the blood sample introduced into the cell,

applying a potential to the electrodes to detect the presence of the blood sample in the cell,

placing the blood sample into the cell,

removing the potential to the electrodes after the blood sample is detected in the cell,

selectively oxidizing the compound in the blood sample with an oxidized electron acceptor to produce an oxidized form of the selected compound and a reduced electron acceptor, and

re-applying a potential across the cell electrodes after the selective oxida-

tion of the compound in the blood sample has substantially completed and measuring the resulting Cottrell current, said current being proportional to the concentration of the reduced electron acceptor and the selected compound in the blood sample.

\* \* \* \* \* \*

*47. A method for measuring the amount of glucose in blood, comprising:*

*providing a measuring cell with at least first and second electrodes for contact with blood introduced into the cell,*

*applying a potential across the electrodes after the volume of blood is placed into the measuring cell,*

*oxidizing the glucose in the blood with an oxidized electron acceptor in the presence of glucose oxidase to produce gluconic acid and a reduced electron acceptor,*

*re-applying a potential across the measuring cell electrodes after the oxidation of glucose has substantially completed, and*

*measuring the Cottrell current through the cell, the Cottrell current being proportional to the glucose concentration in the blood.*

'268 Patent, col.13, l. 57 to col. 18, l. 49 (italics in original).

Bayer asserts that Roche has no evidence to prove that its devices infringe the "substantially to completion" and the "buffer" limitations. Those terms as they are used in the '268 patent were construed by the Court after a *Markman* hearing. The Court determined that "substantially to completion" or "substantially completed" in the '268 patent means "nearly to the end or nearly ended in the entire sample." "Buffer" was construed to mean "a solute that resists change in pH of the reaction solution."

## B. THE ACCUSED DEVICES & THE "SUBSTANTIALLY COMPLETE" ELEMENT

In 1992, a predecessor of Bayer, Miles Laboratories, Inc. ("Miles"), entered into a relationship with Kyoto Daiichi Kagaku Co., Ltd. ("KDK") to introduce a blood glucose monitoring system using electrochemical detection. Bayer Mem. in Supp. of S.J. of Non–Infringement, at 2–3 ("Bayer Mem. in Supp."). In the "electrochemical" system, glucose reacts in a test strip to produce an electrical current that is detected by a meter. *Id.* at 3. These systems are manufactured by Matsushita Electric Industrial Co., Ltd. ("Matsushita"), which owns a number of patents covering its inventions in this field, some of which were prior art to the '268 patent. *Id.* Apparently, Matsushita disclosed its original meter in 1990 and started selling it in September 1991 as the "Glucocard." Pl.'s Exh. 57A, Letter, To: Tech. Review Bd., From: D. Fox & G. Shepherd, RE: Project Mgmt. Overview for Glucometer® Elite™, Feb. 2, 1993, at 1–2 ("Miles Proj. Mgmt. Overview").

Bayer has sold two versions of the Matsushita glucose test systems under the trademark Glucometer Elite®: the 30–second and 60–second products (respectively, "30–Second Elite" and "60–Second Elite"). Bayer Mem. in Supp., at 3. Bayer has also developed and sold its own glucose monitoring system, which it markets under the DEX® trademark ("DEX"). *Id.* These three products are the accused devices. *Id.* All three of the accused devices measure glucose in a blood sample. *Id.* at 10. Further, all use glucose oxidase as the enzyme and ferricyanide as the oxidant. *Id.*

The Elite products operate identically to the Glucocard system. Pl.'s Exh. 57 A, Miles Proj. Mgmt. Overview, at 2. Before making the decision to market the Gluco-

card system in the United States, Miles scientists, including Dr. J. Oakey Noell ("Dr.Noell") and Dr. Abe Ismail ("Dr.Ismail"), noted that "[a]fter an initial detection voltage, [KDK] leave[s] the system down for most of the 60–second test period ... [t]hen they turn it on and make the measurement." Pl.s' Exh. 49, Memo, To: A. Wynn, J. Landau, From: G. Shepherd, RE: Kyoto Daiichi Issues to Resolve for the Due Diligence Disc. Glucocard Sys., Nov. 27, 1991, at 0197531. Miles inquired about this observation asking "Why does the test take 60 seconds to complete versus much shorter test times from competitive systems?" *Id.* at 0197527. In response, KDK stated: "In case of low glucose level and high temperature, the reaction completes in, for instance, as short as 30 seconds. However, in the case of high glucose and low temperature, the reproducibility may become poor because the reaction is still in the course." Pl.'s Exh. 51, Ltr. & Ans. to Questionaire, To: Dr. Anthony Wynn, Ph. D., From: Y. Nakamura, KDK, Dec. 28, 1991, at 0184737. In later follow up inquiries Miles scientists did not ask for clarification on this issue. Pl.'s Exh. 224, Memo, To: R. Williams, From: G. Shepherd, RE: Follow-up Questions & New Issues on DIC Glucocard Sys. Final Version, Jan. 17, 1992, at 0197551.

Professor Christopher R. Lowe ("Professor Lowe"), Bayer's expert, testified that "prior to the conversion of all the glucose in the sample, a chemist would not say the reaction is completed." Lowe Dep. at 422–23. Similarly, Dr. Allen J. Bard ("Dr.Bard"), another expert witness who testified in this case, opined that "it is not possible for a reaction to reach substantial completion in one region, converting all the initial ingredients that are capable of being converted, while remaining uncompleted in other adjoining regions." Pl.'s Tab 53, Rep. of Allen J. Bard, Ph.D. in Connection with Inverness's Claim Con-

struction Submission Concerning U.S. Patent No. Re 36,268, at 18–19 ("Bard Rep.").

In the 60–Second Elite system, during the initial fifty-five second "accumulation period," glucose in the sample reacts with an enzyme (glucose oxidase) to form a "pool of ferrocyanide." Pl.'s Exh. 57A, Miles Proj. Mgmt. Overview, at 0082471. A potential of 0.5 volts is then applied and the "current produced by converting ferrocyanide back to ferricyanide is measured." *Id.* A Bayer document describes the current-time relationship of the 60–Second Elite system as follows: "The current-time relationship is covered by the diffusion of the reduced mediator to the electrode surface and is represented mathematically by the Cottrell equation." Pl.'s Exh. 246, Summary of Mediator Chemistry, at 0223709. The Cottrell equation defines current as a function of time and varies according to one divided by the square root of time. Pl.'s Tab 48, First Lowe Rep., ¶ 24. Professor Lowe defined "Cottrell current" as current that follows the Cottrell equation. *Id.* He concluded that "[a]s long as uncoverted glucose is present in the sample ..., the application of a potential cannot possibly give a Cottrell current." *Id.* ¶ 32. Similarly, Dr. Noell testified that it was his understanding that "in order to follow Cottrell behaviour [sic] you have to both obey the Cottrell equation and meet all the conditions of a Cottrell behaviour [sic], one of which would be completion." Noell Dep. at 567.

On or about August 21, 1992, Dr. Dijia Huang ("Dr.Huang"), a Bayer scientist, wrote a paper about the Glucocard system entitled "Things that the Shape of the Reaction Current of an Amperometric Glucose Sensor Can Tell." Pl.'s Exh. 177, Monthly Rep., To: Randy Miller, From: Dijia Huang, Aug. 21, 1992, Attach., at 0015813 ("Huang Paper"). Dr. Huang reported that in his experiments with the

Glucocard system, the sample was applied, then a period of 55 seconds transpired after which a 0.5 volt potential was applied. *Id.;* Huang Dep. at 144. Dr. Huang concluded that if there were no continued reaction involving glucose at the time of the application of the potential, the "reaction current would be the *Cottrell* current" and "the decay factor would be 0.5." Pl.'s Exh. 177, Huang Paper, at 0015815 (italics in original).

In 1993, Bayer apparently began selling the 60–Second Elite in the United States. Pl.'s Exh. 85, Spreadsheet, Glucometer Elite Sys. Differences; Ismail Dep. at 246. The 60–Second Elite system has a 0.5 volt potential applied after fifty-five seconds; the current is measured five seconds later. Pl.'s Exh. 57A, Miles Proj. Mgmt. Overview, at 0082471; Ismail Dep. at 27–28.

Dr. Marvin Genshaw ("Dr.Genshaw"), an electrochemist who works for Bayer, reported in June of 1994 that in the 60–Second Elite system, after three seconds, "slope [of plots of current v. time] is about that expected for diffusion control." Pl.'s Exh. 154, Monthly Rep. for June, To: M. Musho, From: M.A. Grenshaw, June 27, 1994, at 0220172. The observed slope was "[s]omewhere in the neighborhood of minus 0.5." Genshaw Dep. at 209–10. Dr. Genshaw ruled out a kinetically controlled system because there was "little difference between a delay of 15 and 55 seconds." Pl.'s Exh. 154, Monthly Rep. for June, To: M. Musho, From: M.A. Grenshaw, June 27, 1994, at 0220172. In a "kinetic" device, as opposed to a "diffusion device," a "reaction is going on while the current is being measured." Bard Dep. at 286. *See also* Genshaw Dep. at 115–16.

After the 60–Second Elite system went on sale in the United States, Miles and KDK began work to reduce the time required for the test. Pl.'s Exh. 301, Internal Memo, Miles Diagnostic Div., To: Tech. Approval Bd., From: A. Ismail, S

Haugh, RE: Glucometer Elite with Memory—Proj. History & Overview, Mar. 14, 1995, at 0069161. In anticipation of a visit by KDK to discuss this issue, Dr. Ismail, at Bayer, sent questions to KDK. Pl.'s Exh. 69, Ltr., To: Kin'ichi Yamada, From: Abe Ismail, RE: Visit of QA Staff to Elkhart, Sept. 19, 1995. On September 21, 1995, KDK wrote to Dr. Ismail that "[i]n order to be able to obtain equally trustful data for both the 30 sec. and 60 sec. meters, we have improved the reaction level of CMC by upgrading the purity." Pl.'s Exh. 70, Ltr., To: Dr. Abe Ismail, From: KDK, RE: Visit of QA Staff to Elkhart, Sept. 21, 1995, at 151762.

When Bayer applied for FDA approval of a new Elite system in which the results were obtained in thirty seconds as opposed to sixty seconds, the FDA posed questions to the company. In an internal memo, Dr. Ismail answered the FDA's questions regarding the reduction in time writing:

> The incubation time in the proposed Elite has been reduced from 60 to 30 seconds. This became possible by using a purer grade of Carboxy Methylcellulose (CMC) which has a higher degree of solubility, allowing the active ingredients to dissolve and mix more quickly with whole blood, without loss of precision. This led to faster reaction rates that approximated the reaction end-points much faster than the old CMC grade.

Pl.'s Exh. 72, Internal Bus. Form, To: R. Savol, From: Abe Ismail, RE: Glucometer Elite XL—FDA Questions, Jan. 24, 1997, at 0057572. Dr. Ismail testified that "endpoint" as used in this document meant "the reaction is finished, it's complete, it's done" and is "totally stopped." Ismail Dep. at 68. Dr. Ismail considers the "end-point" and "completion" of a chemical reaction synonymous. *Id.* at 68–69. Similarly, Dr. Genshaw testified that the usual usage of the term "end-point" "is that the reaction

has gone 100 percent, complete conversion of one chemical entity to another." Genshaw Dep. at 107. Professor Lowe, Bayer's expert, also testified that a reaction "was stopped when the reaction is finished and all the glucose is converted into the product." Lowe Dep. at 423.

In its answers to the FDA, Bayer's final response stated that the new CMC in the 30–Second Elite system "approximated the reaction end-points much faster than the 'old' CMC grade." Pl.'s Exh. 501, Ltr., To: Office of Eval., FDA, From: Roseanne M. Savol, Bayer, Attach.: Corp. Bus. Group Diagnostics Glucometer Elite® Blood Glucose Meter (Modified) 510(k) Premarket Notification, Performance Studies Supplement, Resp. to FDA Reviewer's Questions, Jan. 30, 1997, at 0363355 ("FDA Questions Response"). Bayer referred the FDA to a figure entitled "Relationship of Elite Signal to Time" in which signal results for high and low glucose levels are reported at thirty and sixty seconds for the old CMC and the new CMC. Id. at 0363359.

Bayer began selling the 30–Second Elite in 1996. Pl.'s Exh. 85, Spreadsheet, Glucometer Elite Sys. Differences; Ismail Dep. at 169.

Dr. Stephen G. Weber ("Dr.Weber") performed tests on Elite strips measuring current-time transients at various incubation times. Second Weber Rep. at 74. He measured the slope of the current decay for the period from 1 second to 5 seconds after application of the potential. Id. Professor Lowe admitted that this is the appropriate time period for measuring this slope. Lowe Dep. at 595–96. For low glucose levels, 50 and 85 mg/dL, the calculated slope was –0.5, or "very close to theoretical" Cottrell current. Id. at 75. For higher concentrations, 180 mg/dL, the slope was –0.465, or "well within 0.05 of theoretical." Id.

Dr. Weber also determined the current generated by the Elite strips after differ-ent delay periods, a technique that he determined was comparable to the procedures used in various Bayer documents to test whether the reaction was ongoing. Id. at 22–30. He explains those procedures in his report in detail. See id. Using that test, Dr. Weber determined that for low glucose levels, "the magnitude of the signal current at 25 s[econds] is very close [to] that of the average of the current at 60–90 s[econds]." Id. at 38–40. For the highest concentration, 480 mg/dL, the current at 25 seconds was about 82 percent of the average of the currents at 60 to 90 seconds. Id.

Taking into account all the available evidence, including Bayer documents showing the size of the sample, and the geometry of the Elite strips, Dr. Weber concluded that the "reaction has gone nearly to completion in the whole sample certainly for the lower three concentrations." Id. at 41. See also id. at 41–45. He explained: "[T]he unchanging or nearly unchanging signal at the lower glucose concentrations reflects an unchanging level of ferrocyanide, this can only be possible if the reaction has nearly completed." Id. at 41.

Bayer began selling the DEX in the United States in 1999. Noell Dep. at 376. On August 26, 1997, Steve Charlton reported to Dr. Matthew Musho ("Dr. Musho") on the DEX system. Pl.'s Exh. 369, Internal Memo, Monthly Rep., To: Matthew Musho, From: Steve Charlton, Aug. 26, 1997, at 0222054. He described the DEX system as a "[h]omogeneous-phase conversion format + diffusion controlled reaction." Id. Steve Charlton explained that the conversion of glucose to ferrocyanide "takes place in homogeneous phase during the wait time of the assay and is followed by electrochemical determination of the ferrocyanide at a relatively high potential such that the reoxidation rate is diffusion limited." Id. According to

Dr. Musho, the term "homogeneous" in this report means that the solution is uniform in concentration. Musho Dep. at 217–18. Similarly, Professor Lowe, Bayer's expert, stated that the solution cannot have a uniform concentration unless the reaction has gone to completion in the entire sample. Lowe Dep. at 422. Moreover, Professor Lowe stated that current is not "diffusion controlled" unless the reaction in the sample has gone to completion. First Lowe Rep., at 12.

On March 28, 2000, Dr. Genshaw reported a "remarkable" finding that in the DEX system 95% of the glucose was converted to current after thirty seconds. Pl.'s Exh. 170, at 0021769.

Dr. Weber measured the current in the DEX strips as a function of time, and determined that the measured current did not change significantly after twenty seconds. Second Weber Rep., at 62–65. Taking into account all the available information, including measurements of and the geometry of the DEX strips, Dr. Weber concluded that "for the DEX strips the reaction has gone nearly to completion in the whole sample before the meter applies the potential." *Id.* at 63, 66–69.

In contrast to analysis performed by Roche's expert, Bayer's expert, Professor Lowe, concludes that the reaction in the 30–Second Elite, the 60–Second Elite and the DEX products have not substantially completed before the potential is applied. Professor Lowe started with the conclusion that "nearly ended" "can only be interpreted as very close to 100% conversion of glucose to gluconic acid. Clearly, and quite patently obviously, anything less than 90% is nowhere near complete or ended." Lowe Rep. ¶ 12. Professor Lowe's experiments were designed to measure directly the concentration of the reactants and products before and after the reaction under the conditions the strips are actually used. *Id.* ¶ 13. Following this chemical equation for the glucose reaction, Glucose + 2 Ferricyanide + $H_2O$ -> Gluconic Acid + 2 Ferrocyanide, Professor Lowe used standard testing procedures to measure the amount of glucose remaining on the Elite test strips and the DEX test strips by stopping the reaction on each type of strip as quickly as possible at the end of the respective incubation period. *Id.* ¶¶ 14–17. According to Professor Lowe's results, and those of an independent laboratory that ran similar tests, in the samples tested less than half of the glucose had reacted at the incubation end point.[1] *Id.* ¶ 17; *id.* Table I: Mean % Glucose Consumed; Def.'s App. at 130–33, Wayne K. Way, Ph.D., Vice Pres. Tech., Chemir/Polytech Labs., Inc., Analysis of Glucose Test Strips by Chemir/Polytech Labs., June 13, 2002.

Based on these results, Professor Lowe opines that in both the Elite systems and in the DEX system, "the oxidation of glucose with the concomitant generation of gluconic acid and ferrocyanide cannot be considered to be 'nearly to the end or nearly ended in the entire sample'." Lowe Rep., ¶ 25.

## C. THE "BUFFER" ELEMENT

In the '268 patent, claim 1 and its dependent claims require a "buffer." *See* '269 Patent, col. 13, *l.* 57 to col. 14, *l.* 51. The relevant portions of claim 1 read: "a measuring cell having at least a first and second electrode and said cell containing

---

1. Professor Lowe also performed tests that measured the amount of gluconic acid produced and the amount of ferrocyanide produced at the respective incubation period end points. *See* Lowe Rep., ¶¶ 18–23. These experiments yielded similar results suggesting that less than half of the glucose was converted by the end of the incubation period. *Id.* ¶¶ 20, 23.

an oxidant and a buffer, ... placing a sample of fluid to be tested in said cell, [and] reconstituting said oxidant and buffer with said sample fluid to generate a predetermined reaction...." *Id.* col. 13, *ll.* 59–64. As stated above, in the *Markman* phase of this case, the Court determined that "buffer" means "a solute that resists change in pH of the reaction solution."

Bayer documents demonstrate that the Elite sensors include carboxymethylcellulose ("CMC"). Pl.'s Exh. 688, Ltr. & Attach., RE: Canadian ODB Submission, To: Miles, Inc., From: KDK, Reagent Electrode Composition Table, Apr. 6, 1993, at 0129542. CMC is a known buffer. Second Weber Rep., at 95. In addition, an article published by Matsushita in 1990 states that it obtained glucose oxidase for its test strips from Sigma–Chemical. Pl.'s Exh. 546, Mariko Kawaguri, *et al.*, Disposable Glucose Sensor Employing Potassium Ferricyanide as a Mediator, Vol. 58, No. 12, Denki Kagaku, at 1119–24, Aug. 25, 1990, at 0284029. Records of Sigma Chemical and its United States affiliate, Sigma Aldrich, show that since 1994 Matsushita has purchased a particular type of glucose oxidase, G6032, and purchased this glucose oxidase throughout the relevant time period. Haynes Dep. at 12–13, 15–18, 43; Pl.'s Exh. 608, Summary, Sigma Aldrich Sales of Glucose Oxidase to Matsushita; Pl.'s Exh. 609, Sigma Aldrich/Sigma Chemical Sales Record of G6032. According to Sigma Chemical, its G6032 glucose oxidase includes both "phosphate buffer salts" and gluconic acid (or gluconate). Haynes Dep. at 36, 43. Moreover, tests by an independent laboratory confirm that the Elite test strips include gluconate. Second Weber Rep., at 97. Gluconate is a known buffer. *Id.* at 96.

Dr. Weber conducted tests that confirmed that the reagents in the 30–Second Elite resist a change in pH of the reaction solution. Second Weber Rep., at 97–98;

Hill Aff. ¶ 3. Apparently, the 60–Second Elite strips are no longer available but Dr. Weber concludes that they contained the same buffers, CMC, phosphate and gluconate. Second Weber Rep., at 96, 99.

With respect to the DEX, Bayer documents state that the DEX sensor includes "about equimolar levels of Na+ and K+ in a phosphate buffer system." Pl.'s Exh. 689, Memo, To: A. Litwin, From: G. Shepherd, RE: Updated Comments on DE Consumable Mfg., Mar. 6, 1994, at 0140994. Further, Dr. Musho wrote a memo that describes the contents of the DEX sensor, in part, as "lesser components include ... citrate for buffering." Pl.'s Exh. 371, Memo, To: George Tanco, From: Matthew Musho, RE: DEX Improvement Projects, Apr. 6, 1999, at 0010208. In addition, Bayer documents show that the DEX strips include sodium citrate and citric acid, which are described as "pH-buffer[s]" that are "used in chemical ink to have stable pH in blood during measurement; pH is critical to enzyme performance." Pl.'s Exh. 538, Rep., DEX Glucometer Task Force, June 16, 1998, at 0250891. Finally, two Bayer scientists, Dr. Kin Fai Yip and Dr. Genshaw, testified that the DEX product contains a buffer. Yip Dep. at 168; Genshaw Dep. at 275.

Blood also contains buffers. Lowe Dep. at 572; Yip Dep. at 179; Ismail Dep. at 142.

Bayer's expert, Professor Lowe, performed experiments to determine if any of the reagents on the Elite or DEX test strips resisted a change in pH of the reaction solution. In one test, Professor Lowe added acid to the reagents used to make the DEX test strips. Lowe Rep., ¶ 36. The pH of the test solution fell rapidly, suggesting no buffering capacity in that solution. *Id.* ¶ 36.

In the second test, the pH in the 30–Second Elite strip was tested as a strip

underwent reaction with and without blood. Lowe Rep., ¶¶ 37–38. According to Professor Lowe, only the samples containing blood showed no changes in pH, or buffering effects. *Id.; id.* Table IV.

## D. PRIOR ART REFERENCES

Bayer asserts that the claims of the '268 patent were anticipated or made obvious by several disclosures. Specifically, Bayer asserts that two abstracts written by the '268 patent's inventors before the filing date of the patent describe a two-step process of enzymatic chronoamperometry. Lowe Rep. ¶ 55. In addition, one of the inventors, Jordan, described the use of "Cottrell current" for biosensing purposes on or about February 1987. *Id.*

Furthermore, Bayer asserts that "all of the features of the claims ... were a mere matter of routine for one skilled in the art of biosensors, particularly those using enzymatic and electrochemical methods" when one skilled in the art looked at several other prior art references. For example, Bayer argues that U.S. Patent No. 3,623,960 (Filed April 7, 1971) ("'960 patent") discloses a two-step process for quantifying the glucose in a sample. Bayer asserts that the system described by the '960 patent involves a reaction in an open circuit, the application of a potential and measurement of a current that is proportional to the amount of glucose oxidized. Lowe Rep. ¶ 57 (citing '960 Patent, at page 3, *ll.* 10–19). Moreover, Bayer asserts that the '960 patent teaches that a buffer should be used to maintain the pH between certain levels. *Id.* (citing '960 Patent, at page 3, *ll.* 52–57).

In addition, Bayer asserts that U.S. Patent No. 4,897,173 (Filed June 19, 1986), refers to Japanese Laid Open Patent Application NO. 59–166852, in which a "glucose oxidase reaction proceeds to completion or substantially to completion and results in the reduction of a specific

amount of electron acceptor, which is proportional to the amount of analyte." Lowe Rep. ¶ 59. Apparently, the reference also discloses that the analyte concentration is inferred from a current measurement after an incubation period of two minutes. *Id.*

Bayer also argues that European Patent No. 0–255–291–B1 (filed July 23, 1987) discloses a method for electrochemical measurements of an enzymatic reactant. *Id.* ¶ 60. Bayer asserts that although the patent teaches that "it may not be necessary in all cases to deplete completely the electrochemical species being measured (p. 4, lines 20–30) ... [t]he patent implies the measurement of a diffusion limited current, i.e. Cottrell current, and discusses the advantages of doing this (p.5, lines 24–48)." *Id.* Moreover, this patent discloses the use of a buffer in the measurement cell. *Id.*

Bayer asserts that "[o]ther patents claim automatic detection of sample application." *Id.* ¶ 61. Bayer lists U.S. Patent No. 4,935,105, U.S. Patent No. 5,049,487, Japanese Laid Open Patent No. Sho 62/1987–156553 (Filed July 11, 1987) in support of this statement. *Id.*

From analysis of these prior art disclosures, Bayer's expert, Professor Lowe, concludes that "[i]t is clear ... that all the elements of patent 36,268 were a matter of routine and obvious to a person skilled in the art." *Id.* ¶ 62.

Bayer describes a person of ordinary skill in the art as follows:

individuals who, by education or experience, are knowledgeable concerning chemical analytical methods, electrochemistry, chronoamperometry, enzymatic amperometry, use of current to quantitatively measure analytes and fluids, enzyme catlyzed reactions, diagnostic devices and/or testing of glucose or other analytes in body fluids. This

[definition] is based on the patent-in-suit, which defines the subject matter at issue.

Roche App. Exh. 2, Bayer Corp.'s Am. Resps. and Objs. to Roche's First Set of Interrogs. to Bayer Corp., Mar. 2, 2001, at 6.

Roche asserts that Bayer's evidence fails to show that a single prior art reference includes each and every limitation of the '268 patent. In addition, as to one prior art reference, Bayer has no evidence that the report was ever public. Therefore, Bayer's defense of anticipation should fail as a matter of law.

In addition, Roche asserts that Bayer cannot prevail on its obviousness defense because it did not properly identify one of ordinary skill in the art and because it did not identify what would have motivated one of ordinary skill in the art to combine the references Professor Lowe discloses to make the invention described by the '268 patent. Roche argues that Bayer's laundry list of prior art and the disclosures therein does not meet the burden of showing which references could be combined to make the '268 patented invention. Nor does Bayer suggest a motivation to combine. Roche asserts that Bayer relies exclusively upon the laundry list of prior art disclosures as evidence of a motivation to combine. Roche argues that such a list without reference to "specific suggestions in the prior art or knowledge of one with ordinary skill in the art to motivate the combinations" Bayer has failed to evidence a necessary element of obviousness. For these reasons, Roche avers that Bayer's obviousness defense fails as a matter of law.

## II. STANDARDS

### A. SUMMARY JUDGMENT

Summary judgment is granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c). See also CAE Screenplates v. Heinrich Fiedler GmbH, 224 F.3d 1308, 1316 (Fed.Cir.2000). An issue is genuine only if the evidence is such that a reasonable jury could return a verdict for the opposing party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A disputed fact is material only if it might affect the outcome of the suit in light of the substantive law. See id. The moving party has the initial burden to show the absence of genuine issues of material fact. See Wollin v. Gondert, 192 F.3d 616, 620 (7th Cir.1999); Schroeder v. Barth, 969 F.2d 421, 423 (7th Cir.1992). This burden does not entail producing evidence to negate claims on which the opposing party has the burden of proof. See Green v. Whiteco Indus., Inc., 17 F.3d 199, 201 & n. 3 (7th Cir.1994). The party opposing a summary judgment motion bears an affirmative burden of presenting evidence that a disputed issue of material fact exists. See Wollin, 192 F.3d at 621; Gonzalez v. Ingersoll Milling Mach. Co., 133 F.3d 1025, 1031 (7th Cir.1998); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); Scherer v. Rockwell Int'l Corp., 975 F.2d 356, 360 (7th Cir.1992). The opposing party must "go beyond the pleadings" and set forth specific facts to show that a genuine issue exists. See Wollin, 192 F.3d at 621; Stop–N–Go of Madison, Inc. v. Uno–Ven Co., 184 F.3d 672, 677 (7th Cir. 1999); Hong v. Children's Mem. Hosp., 993 F.2d 1257, 1261 (7th Cir.1993), cert. denied, 511 U.S. 1005, 114 S.Ct. 1372, 128 L.Ed.2d 48 (1994). This burden cannot be met with conclusory statements or speculation, see Cliff v. Bd. of Sch. Comm'rs, 42 F.3d 403, 408 (7th Cir.1994) (citing

*McDonnell v. Cournia*, 990 F.2d 963, 969 (7th Cir.1993)); *accord Chapple v. Nat'l Starch & Chem. Co.*, 178 F.3d 501, 504 (7th Cir.1999); *Weihaupt v. Am. Med. Ass'n*, 874 F.2d 419, 428 (7th Cir.1989), but only with appropriate citations to relevant admissible evidence. *See* Local Rule 56.1; *Brasic v. Heinemann's Inc., Bakeries*, 121 F.3d 281, 286 (7th Cir.1997); *Forman v. Richmond Police Dept.*, 104 F.3d 950, 957 (7th Cir.1997); *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 923–24 (7th Cir.1994). Evidence sufficient to support every essential element of the claims on which the opposing party bears the burden of proof must be cited. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

In considering a summary judgment motion, a court must draw all reasonable inferences in the light most favorable to the opposing party. *See Johnson Worldwide Assocs., Inc. v. Zebco Corp.*, 175 F.3d 985, 988 (Fed.Cir.1999); *Wollin*, 192 F.3d at 621; *Thomas & Betts Corp. v. Panduit Corp.*, 138 F.3d 277, 291 (7th Cir.1998); *Spraying Sys. Co. v. Delavan, Inc.*, 975 F.2d 387, 392 (7th Cir.1992). If a reasonable fact finder could find for the opposing party, then summary judgment is inappropriate. *Stop–N–Go*, 184 F.3d at 677; *Shields Enters., Inc. v. First Chi. Corp.*, 975 F.2d 1290, 1294 (7th Cir.1992). When the standard embraced in Rule 56(c) is met, summary judgment is mandatory. *Celotex Corp.*, 477 U.S. at 322–23, 106 S.Ct. 2548; *Thomas & Betts*, 138 F.3d at 291; *Shields Enters.*, 975 F.2d at 1294.

## B. PATENT INFRINGEMENT

Reviewing whether a device infringes a patent is a two step process. *See CAE Screenplates*, 224 F.3d at 1316; *K–2 Corp. v. Salomon S.A.*, 191 F.3d 1356, 1362 (Fed. Cir.1999). First, a court must interpret the disputed claims, "from a study of all relevant patent documents," to determine their scope and meaning. *K–2 Corp.*, 191

F.3d at 1362. *See also Dolly, Inc. v. Spalding & Evenflo Cos., Inc.*, 16 F.3d 394, 397 (Fed.Cir.1994). Second, a court must determine if the accused device, system or process comes within the scope of the properly construed claims, either literally or by a substantial equivalent. *See K–2 Corp.*, 191 F.3d at 1362; *Dolly*, 16 F.3d at 397; *SmithKline Diagnostics v. Helena Labs. Corp.*, 859 F.2d 878, 889 (Fed.Cir. 1988). In this case, the first phase of the infringement analysis, claim construction, occurred prior to the instant summary judgment motions. Therefore, the Court must focus on whether Bayer's devices come within the scope of the claims as they were previously construed by the Court.

Ordinarily, to prove infringement of a patent, the plaintiff must show by a preponderance of the evidence that every limitation of the claim asserted to be infringed has been found in an accused device or process, either literally or by an equivalent. *See Becton Dickinson & Co. v. C.R. Bard, Inc.*, 922 F.2d 792, 796 (Fed.Cir. 1990); *Pennwalt v. Durand–Wayland, Inc.*, 833 F.2d 931, 935 (Fed.Cir.1987), *cert. denied*, 485 U.S. 961, 108 S.Ct. 1226, 99 L.Ed.2d 426 (1988) & 485 U.S. 1009, 108 S.Ct. 1474, 99 L.Ed.2d 703 (1988). With a method or process patent, however, the focus is on whether all of the claimed steps of the process or method are performed, either as claimed or by an equivalent step. *EMI Group N. Am., Inc. v. Intel Corp.*, 157 F.3d 887, 896 (Fed.Cir.1998), *cert. denied*, 526 U.S. 1112, 119 S.Ct. 1756, 143 L.Ed.2d 788 (1999); *Williams Gold Ref. Co. v. Semi–Alloys Inc.*, 434 F.Supp. 453, 454 (W.D.N.Y.1977) ("[I]t is the series of steps comprising the process that is central and only a replication of every step ... constitutes infringement."). This is because a method or process patent is only infringed when the alleged infringer practices or performs the claimed method or process. *See Joy Techs., Inc. v. Flakt,*

*Inc.*, 6 F.3d 770, 775 (Fed.Cir.1993); *Giese v. Pierce Chem. Co.*, 29 F.Supp.2d 33, 36 (D.Mass.1998).

Absent a finding of literal infringement, a court could find that an accused device infringes by applying the judicially-created equitable doctrine of equivalents. *See CAE Screenplates*, 224 F.3d at 1318; *Becton Dickinson*, 922 F.2d at 797; *ZMI Corp. v. Cardiac Resuscitator Corp.*, 844 F.2d 1576, 1581 (Fed.Cir.1988); *Pennwalt*, 833 F.2d at 934. Under this doctrine, an accused device may still infringe a claim "if each and every limitation of the claim is literally or equivalently present." *CAE Screenplates*, 224 F.3d at 1318–19. "A claim limitation is 'equivalently present' in an accused device if there are only 'insubstantial differences' between the limitation and corresponding aspects of the device." *Id.* at 1319 (quoting *Hilton Davis Chem. Co. v. Warner–Jenkinson Co.*, 62 F.3d 1512, 1517–18 (Fed.Cir.1995), *rev'd on other grounds*, 520 U.S. 17, 117 S.Ct. 1040, 137 L.Ed.2d 146 (1997)). Generally, infringement by equivalents is an issue of fact. *See id.* But, a district court may grant partial or complete summary judgment where the evidence is such that no reasonable jury could determine two elements to be equivalent. *Id.*

## C. VALIDITY

By statute, a patent is presumed to be valid. 35 U.S.C. § 282. The party challenging a patent's validity must prove invalidity by clear and convincing evidence. *See Apple Computer Inc. v. Articulate Sys., Inc.*, 234 F.3d 14, 26 (Fed.Cir.2000); *Oney v. Ratliff*, 182 F.3d 893, 895 (Fed.Cir. 1999) (citing *Finnigan Corp. v. Int'l Trade Comm'n*, 180 F.3d 1354 (Fed.Cir.1999)); *Am. Hoist & Derrick Co. v. Sowa & Sons, Inc.*, 725 F.2d 1350, 1360 (Fed.Cir.1984). In the present procedural posture, "[s]ummary judgment is inappropriate if a trier of fact applying the clear and convincing standard could find for either party." *Oney*, 182 F.3d at 895.

An accusation of anticipation is based on the requirement that an invention be novel or new. "The novelty requirement lies at the heart of the patent system." I DONALD S. CHISUM, CHISUM ON PATENTS § 3.01 (Rel. No. 71, Sept. 1999) (hereinafter "CHISUM ON PATENTS"). The defense of anticipation "requires that the same invention, including each element and limitation of the claims, was known or used by others before it was invented by the patentee." *Hoover Group, Inc. v. Custom Metalcraft, Inc.*, 66 F.3d 299, 302 (Fed.Cir.1995). *See also MEHL/Biophile Int'l Corp. v. Milgraum*, 192 F.3d 1362, 1365 (Fed.Cir.1999); *C.R. Bard, Inc. v. M3 Sys., Inc.*, 157 F.3d 1340, 1349 (Fed.Cir. 1998); *Hupp v. Siroflex of Am., Inc.*, 122 F.3d 1456, 1461 (Fed.Cir.1997). A challenger cannot prove anticipation "by combining more than one reference to show the elements of the claimed invention." CHISUM ON PATENTS § 3.02. Thus, a prior patent or device must contain all of the elements and limitations in the disputed patent as arranged in the patented device. *See C.R. Bard*, 157 F.3d at 1349; *Hoover Group*, 66 F.3d at 303. But, "a prior art reference may anticipate when the claim limitations not expressly found in that reference are nonetheless inherent in it." *MEHL/Biophile Int'l*, 192 F.3d at 1365. Anticipation is a question of fact, but may be decided on summary judgment if there is no genuine issue of material fact. *Oney*, 182 F.3d at 895.

Novelty also is related to the nonobvious requirement. If the invention is novel, then "further inquiry must be made into whether it is new enough" to be patented. CHISUM ON PATENTS § 3.01 "A claimed invention is unpatentable if the differences between it and the prior art 'are such that the subject matter as a

whole would have been obvious at the time the invention was made to a person having ordinary skill in the art.'" *Robotic Vision Sys., Inc. v. View Engr'g,* 189 F.3d 1370, 1376 (Fed.Cir.1999) (quoting 35 U.S.C. § 103(a)). *See also Graham v. John Deere Co.,* 383 U.S. 1, 13–14, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966); *Ruiz v. A.B. Chance Co.,* 234 F.3d 654, 662 (Fed.Cir.2000); *WMS Gaming, Inc. v. Int'l Game Tech.,* 184 F.3d 1339, 1355 (Fed.Cir.1999). Determination of whether or not an invention is obvious is a legal conclusion. *Ruiz,* 234 F.3d at 662; *WMS Gaming,* 184 F.3d at 1355. However, the underlying inquiries are factual. *Ruiz,* 234 F.3d at 662; *WMS Gaming,* 184 F.3d at 1355. The factual inquiries for obviousness are 1) the scope and content of the prior art, 2) the level of ordinary skill in the field of the invention, 3) the differences between the claimed invention and the prior art, and 4) any objective evidence of non-obviousness, such as long-felt need, commercial success, the failure of others, or evidence of copying. *See Ruiz,* 234 F.3d at 662–63; *WMS Gaming,* 184 F.3d at 1355; *C.R. Bard,* 157 F.3d at 1351. As discussed above, the party asserting invalidity based on obviousness carries the burden of proof; however, that burden "is more easily carried when the references on which the assertion is based were not directly considered by the examiner during prosecution." *WMS Gaming,* 184 F.3d at 1355 (citing *Applied Mat'ls, Inc. v. Advanced Semiconductor Mat'ls Am., Inc.,* 98 F.3d 1563, 1569 (Fed.Cir. 1996) ("The presentation at trial of additional evidence that was not before the PTO does not change the presumption of validity or the standard of proof, although the burden may be more or less easily carried because of the additional evidence.")). *Accord Am. Hoist & Derrick,* 725 F.2d at 1360.

■ When a challenger asserts an obviousness defense or counterclaim based on two or more prior art references, there must be some suggestion or motivation to combine them. *WMS Gaming,* 184 F.3d at 1355. "The suggestion to combine may be found in explicit or implicit teachings within the references themselves, from the ordinary knowledge of those skilled in the art, or from the nature of the problem to be solved." *Id.*

## III. *DISCUSSION*

### A. INFRINGEMENT OF THE '268 PATENT[2] (BAYER'S MOTION FOR SUMMARY JUDGMENT)

Bayer argues that summary judgment is appropriate on Roche's claim that Bayer's 30–Second Elite, 60–Second Elite and DEX systems infringe the '268 patent for two reasons: 1) because Roche has failed to offer evidence that the reaction in the products goes "substantially to completion" as that term has been defined by the Court; and 2) because Roche has failed to offer evidence that the products contain a "buffer" as that term has been defined by the Court. The Court will address each argument in turn.

#### 1. *"Substantially to Completion" Element*

■ Bayer first argues that because the '268 patent states that in tests used to develop the method 99% of the glucose was converted, then the reaction is "substantially complete" or has "nearly ended" when 99% of the glucose has been oxidized. Bayer asserts that Roche has failed to quantify the amount of glucose oxidized in the allegedly infringing products at all, therefore, summary judgment is appropriate. Bayer Mem. in Supp., at 11. However, Bayer notes that Dr. Weber, Roche's

---

**2.** Bayer objected to Roche's surreply as inappropriate in this case. The Court has been duly advised and finds Bayer's objection should be **OVERRULED.**

expert, opined that when 87% of the glucose had reacted, the reaction was substantially complete. *Id.* at 13 n. 12. Bayer also argues that Roche's expert failed to measure the amount of glucose that had reacted before the potential was applied. Rather, Dr. Weber measured the current in the systems during a period after the potential had been applied. *Id.* at 12. In other words, Dr. Weber did not stop the reaction before measuring the amount of glucose oxidation that had occurred. *Id.* Bayer contends that Dr. Weber has confused the rate of reaction with the extent of completion of the reaction. *Id.* at 13. Notwithstanding that error, Bayer also asserts that Dr. Weber's measurement of current to predict whether the reaction has "substantially completed" in the entire sample is flawed because the current only measures the concentration closest to the electrode. Bayer Reply in Supp. of S.J., at 4–5 ("Bayer Reply").

In addition, Bayer argues that Dr. Weber's report refers to numerous Bayer and third party documents that are either inadmissible or do not relate to the accused products. *Id.* Moreover, the documents do not address the question of the amount of glucose that remains unreacted before the potential is applied or whether the reaction has completed in the entire sample. *Id.*

Finally, Bayer argues that its evidence definitively shows that more than half of the glucose in the sample remains unreacted before the potential is applied. *Id.* at 14–17.

In contrast, Roche argues that Bayer's own documents evidence that the reaction in the 30–Second Elite, the 60–Second Elite and the DEX systems nearly ends in the entire sample as required by the '268 patent. Roche asserts that the current versus time profile for the Elite systems evidence that the reaction has completed before the potential is applied. This method of experiment, Roche contends, was proposed by Bayer scientists and Bayer's expert. Roche Resp. to Bayer's Mot. for S.J., at 23; 28–29 ("Roche Resp."). Moreover, Roche argues that Bayer's expert concluded that a document describing the Elite device showed that the reaction had gone nearly to completion. *Id.* at 24; 30–31.

Similarly, for the DEX system, Roche asserts that Bayer's internal documents recognize that the reaction has nearly ended before the potential is applied (during the incubation period). *Id.* at 31–32. In addition, Roche argues that the experiments that Dr. Weber conducted on the DEX to determine if the reaction had gone substantially to completion were comparable to those previously used by those skilled in the art. *Id.* at 32. Those experiments measured current as a function of delay time. *Id.* From those experiments, Dr. Weber concluded that the current did not change significantly as delay time increased. *Id.* Therefore, Dr. Weber concluded that the reaction was nearly ended in the entire sample before the meter applies the potential. *Id.*

Based on these arguments, the Court finds that Roche has established a genuine issue of material fact on whether the reaction in the 30–Second Elite, the 60–Second Elite and the DEX is "substantially complete" or has gone "substantially to completion" before the potential is applied. Bayer argues at the outset that the reaction is not "nearly ended" in the entire sample unless 99% of the glucose has reacted. However, the Court rejected this argument at the claim construction phase of this case. Although the Court recognizes that the '268 patent specification reports that such yields were obtained by the inventors' experiments, there is nothing to suggest that this limitation has been imported into the claims. Therefore, Bayer's argument is without merit that Roche

has failed to provided evidence of substantial completion because it never numerically quantified the reacted glucose at 99%. Moreover, Bayer acknowledges that Dr. Weber did quantify the extent of the reaction at 87%, albeit using a different test method than that used by Professor Lowe. Dr. Weber opines that 87% reacted is nearly ended or substantially complete. Whether Dr. Weber's opinion is correct or whether Professor Lowe's opinion is correct is a question of fact.

In addition, Bayer's argument that Roche cannot rely upon documents related to development or commercialization of the Elite and DEX products is without merit. First, Bayer produced these documents in discovery and, as pointed out by Roche, they were kept in the ordinary course of business. Second, Roche carefully laid foundations for each piece of evidence it used from third parties to show that Bayer, or Bayer's successor in interest, had adopted the positions in those documents.

With respect to Bayer's argument that Dr. Weber's test method is flawed, the Court finds that the efficacy of Dr. Weber's test methods is a credibility issue rather than one of lack of evidentiary support. Roche has adequately supported its assertion that Dr. Weber's methods have been used by those skilled in the art of electrochemistry to determine whether the reaction is complete in an electrochemical cell. Bayer makes much of the arguments Roche made during the claim construction phase of this case. Specifically, Roche's arguments that the reaction need only be complete in a small layer above the surface of the electrode for Cottrell current to occur. However, Dr. Weber is basing his opinion that the reaction occurs in the entire sample, as required by the construed claims of the '268 patent, on calculations that consider the reaction kinetics of the system and the thickness of the sample wells in the allegedly infringing devices. Dr. Weber's testimony in this regard leads to the inference that the reaction has nearly ended in the entire sample, not only in the area immediately adjacent to the electrode surface. Moreover, whether another expert would come to the same conclusions based on the data is more properly the subject of cross-examination and fact finding than judgment as a matter of law.

By their arguments Bayer and Roche have effectively shown a material question of fact on the issue of whether the reactions in the 30–Second Elite, the 60–Second Elite and the DEX have gone "substantially to completion" before the potential is applied as required by the claims of the '268 patent. Each party has pointed to flaws in the other's test methods. Moreover, each party points to somewhat inconsistent positions taken by the other's expert about where the relevant reaction takes place that could undermine each expert's credibility and support each party's argument that its conclusions are appropriate. The Court will not decide which method of proof on the issue is more persuasive, Bayer's or Roche's; that question is for a jury.

As to the specifics of Roche's proof, the Court finds that Roche's proffered documentary and testimonial evidence that Bayer recognized that the reaction must go to completion before the potential is applied or that the systems were not kinetic, in conjunction with Dr. Weber's tests, report and conclusions stating the same, are enough to create a genuine issue of material fact on whether Bayer's glucose meter systems infringe the '268 patent.

In summary, the Court finds that Roche has evidenced a genuine issue of material fact on the question of whether Bayer's 30–Second Elite, 60–Second Elite and DEX products infringe the "substantially

to completion" or "substantially complete" element of the asserted claims.

## 2. *The "Buffer" Limitation*

 Bayer argues that a buffer must be present as a reagent on the test strip before the blood sample is added. Bayer Mem. in Supp., at 17. Then, once the blood sample is added, the buffer must be a solute in the solution that resists a change in the pH of the reaction solution. *Id.* Bayer asserts that Roche has no evidence that establishes that any of the accused products contain a reagent present on them before the blood sample is applied that resists change in the reaction solution. *Id.* at 17. Moreover, Bayer argues that Roche's evidence that the Elite products contain a buffer fall short because the documents are inadmissable against Bayer, the documents do not evidence that the glucose oxidase referred to is the product actually used by Bayer, the tests Roche performed are irrelevant because they do not measure the change in pH of the reaction solution, and the facts about the DEX strips containing citrate are irrelevant because Bayer's witnesses testified that citrate is used as a buffer during the manufacturing process not during the reaction of blood with the test reagents. Bayer Reply, at 19–20.

Roche argues that its evidence is admissible to show that the Elite and DEX strips contain known buffers that are used to resist changes in pH of the reaction solutions. Specifically, Roche avers that documentary evidence establishes that the Elite strips contain three known buffers, CMC, phosphate, and gluconic acid or gluconate. Roche Resp., at 33. In addition, Bayer's documents show that the DEX strip contains a buffer that is "used in chemical ink to have stable pH in blood during measurement; pH is critical to enzyme performance." Pl.'s Exh. 538, Rep., DEX Glucometer Task Force, June 16, 1998, at 0250891. Moreover, Roche avers

that Dr. Weber performed tests on 30–Second Elite strips and DEX strips that show a smaller change in pH when acid is added to a solution containing the strips than when acid is added to an identical solution without the strips. Weber Rep., at 98. With respect to the 60–Second Elite, Roche argues that the inference that the 60–Second Elite product contained a buffer is supported by the documentary evidence that shows it contained CMC. Further, the documentary evidence shows that the 30–Second Elite evolved from the 60–Second Elite and used a different CMC. Therefore, Roche argues, because its test results show that the 30–Second Elite contained CMC and resists changes in pH, the 60–Second Elite must also resist changes in pH because it contained CMC.

Furthermore, Roche asserts that even without this evidence of buffers, the Bayer products would infringe the '268 patent under the doctrine of equivalents because blood contains buffers that would resist change in pH of the reaction solution. Roche asserts that whether the buffer is on the strip or in the blood is irrelevant with respect to the claims of the patent. Roche Resp., at 34–35. For these reasons, Roche asserts that a material question of fact exists on the issue of whether the Bayer 30–Second Elite, 60–Second Elite and DEX systems have a buffer, or a solute that resists change in pH of the reaction solution.

The Court finds that Roche has evidenced a material question of fact on the issue of whether or not the 30–Second Elite, the 60–Second Elite and the DEX systems contain a buffer as that term is defined by the '268 patent. With respect to the 30–Second Elite and the DEX, Dr. Weber performed tests on sample strips to determine if the reagents thereon would resist a change in pH. Second Weber Rep.

at 97–98; Hill Aff. ¶ 3. His test results indicate that the strips had a buffering effect. Second Weber Rep. at 97–98. Dr. Weber would so testify. Bayer questions these results because they were not performed with blood as part of the "solution." However, as to the element for buffer, the Court agrees with Roche that it need not prove that the buffer on the test strip is better than the buffer inherent in a blood sample, merely that the test strips contains a buffer as that term has been defined by the Court. Dr. Weber's tests in this regard in combination with the documentary and testimonial evidence that the strips contain a buffer raise a question of fact on whether or not a buffer is present on the strips before a blood sample is applied.

Furthermore, Bayer performed tests of its own to determine if the test strips contained a buffer as that term has been defined by the Court. Bayer's results conflict with those of Roche. Faced with competing results, in similar tests, the Court must find that a question remains for the trier of fact.

With respect to the 60–Second Elite product, although the inference is weak that the product actually contained a buffer that resists changes in pH, the Court finds that Roche has evidenced a material question of fact on the issue. Roche's documentary evidence suggests that the 60–Second Elite product included CMC (carboxymethylcellulose). Pl.'s Exh. 688, Ltr. & Attach., RE: Canadian ODB Submission, To: Miles, Inc., From: KDK, Reagent Electrode Composition Table, Ar. 6, 1993, at 0129542. In addition, Dr. Weber suggests that CMC is a known buffer,

or in other words that CMC is a substance that resists changes in pH.[3] Second Weber Rep. at 95. Likewise, Roche's evidence shows that the 30–Second Elite product contained CMC and was derived from the 60–Second Elite product. See Pl.'s Exh. 70, Ltr., To: Dr. Abe Ismail, From: KDK, RE: Visti fo QA Staff to Elkhart, Sept. 21, 1995, at 151702. Dr. Weber's tests suggest that the 30–Second Elite product resists changes in pH of a solution. Second Weber Rep. at 97–98; Hill Aff. ¶ 3. Although the Court recognizes that there are competing inferences in Roche's own documentary evidence that the 30–Second Elite contained buffers that the 60–Second Elite might not have contained, taking the facts in the light most favorable to Roche, there is an inference that the 60–Second Elite product would also resist a change in pH of a solution simply because it contains CMC similar to that of the 30–Second Elite.

Roche also argues that Bayer's products infringe the '268 patent under the doctrine of equivalents because blood contains solutes that resist changes in pH of the reaction solution. But, as Bayer points out, claim 1, and its dependent claims, require that the buffer be part of the measuring cell before the blood sample is applied. In other words, the '268 patent requires that the buffer be part of the "providing a measuring cell" step rather than the "placing a sample of fluid to be tested" step. The Court is not convinced that Roche's argument under the doctrine of equivalents has merit.

However, the Court finds that Roche has evidenced a material question of fact

3. Roche also seems to argue that because Matsushita has purchased a certain type of glucose oxidase that contained a known buffer (gluconate) from Sigma Chemical or Sigma Aldrich since 1994, and because gluconate was found on 30–Second Elite strips, it must have also been a buffer found on the 60–

Second Elite strips. But, the 60–Second Elite was manufactured long before 1994; the evidence shows that the 60–Second Elite was developed as early as 1990 and was sold in the U.S. as early as 1993. Therefore, any inference that the 60–Second Elite strips contained this gluconate buffer is tenuous at best.

on the issue of whether or not the 30–Second Elite, the 60–Second Elite and the DEX contain a buffer as that term has been defined by the Court in the context of the '268 patent.

### 3. *Summary*

The Court has found that Roche has evidenced a material question of fact on the issue of whether the reaction has gone substantially to completion before the potential is applied in Bayer's 30–Second Elite, 60–Second Elite and DEX systems. Furthermore, the Court has found that Roche has evidenced a material question of fact on the issue of whether the 30–Second Elite, the 60–Second Elite and the DEX contain a buffer. Therefore, Bayer's motion for summary judgment on the issue of whether or not its products infringe the "substantially to completion" and "buffer" elements of the '268 patent should be **DENIED.**

## B. VALIDITY OF THE '268 PATENT (ROCHE'S MOTION FOR SUMMARY JUDGMENT)

### 1. *Roche's Motion to Strike Professor Lowe's Declaration* [4]

The Court must first address the parties' extensive arguments regarding admissibility of Professor Lowe's declaration in support of Bayer's opposition to the instant motion. Roche asserts that Federal Rule of Civil Procedure 26(a)(2)(B) ("Rule 26(a)(2)(B)") required Bayer to submit Professor Lowe's entire analysis and any exhibits in support thereof during discovery. Bayer filed Professor Lowe's declaration, and a substantial number of supporting exhibits, in conjunction with its brief in opposition to Roche's motion for summary judgment on invalidity. Professor Lowe's declaration, Roche avers, pro-

vides new analysis, explanation and opinions not previously disclosed. Therefore, the Court should exclude the new material from consideration on summary judgment and at trial. *See* Roche Reply in Supp. of S.J. on Invalidity, at 2–4 (citing Fed. R.Civ.P. 37(c)(1)) ("Roche Reply"). Specifically, Roche asserts that the new material includes Professor Lowe's definition of a person of ordinary skill in the art of the '268 patent, Professor Lowe's claim comparison charts, Professor Lowe's assertion that motivation to combine is suggested by the goal of the prior art to improve biosensors, and Professor Lowe's assertion that the Nankai EPO patent anticipates each claim element of the '268 patent.

Roche argues that Bayer's belated disclosure is harmful to it because Roche did not have the declaration before it took Professor Lowe's deposition or when it prepared its motion for summary judgment. In addition, Roche argues that Bayer's belated disclosure was unjustified because the references upon which Professor Lowe bases his opinions are not newly discovered. All of the references were known to Bayer prior to Professor Lowe's preparation of his initial report. In addition, Roche argues that Professor Lowe's declaration contradicts his deposition testimony; therefore, it is inadmissible.

In contrast, Bayer argues that Professor Lowe's declaration contains no new information. To the contrary, all the information Professor Lowe used in his declaration was either disclosed in his report, clarifies his opinions or rebuts Dr. Weber's report of July 15, 2002. Bayer's Surreply Mem. in Opp'n to Roche's Mot. for S.J., at 5 ("Bayer Surreply"). Bayer asserts that Professor Lowe was not required to dis-

---

4. The parties also argue about statements by Roche about the validity of the '268 patent prior to this litigation. The Court finds that, at the very least, Roche's statements about the validity of the '268 patent are admissible as evidence of the ordinary skill in the art at the time of the invention. Roche's motion to strike this evidence is **DENIED.**

close rebuttal in his report. Bayer avers that Dr. Weber's July 15, 2002, report contends that certain features of the '268 patent claims were not disclosed in the prior art references. Any seemingly new analysis, explanation or opinions in Professor Lowe's declaration, Bayer argues, only properly rebut Dr. Weber's opinions. Furthermore, Bayer argues that Roche itself acknowledged in prior litigation that the Nankai EPO patent anticipated all the elements of the '268 patent claims. *Id.* at 9. Therefore, Roche is not prejudiced by that apparent addition in the declaration.

Bayer argues that sanctions pursuant to Rule 37 are inappropriate because Professor Lowe adequately disclosed the substance of his direct testimony in his report; disclosure of rebuttal testimony was unnecessary. *Id.* at 13. In addition, Bayer asserts that there was no "surprise" to Roche that warrants sanctions. Bayer avers that all the relevant prior art and opinions about that prior art were disclosed to Roche prior to its filing the instant summary judgment motion.

■ Although the Court is troubled by the difference in level of detail between Professor Lowe's report and his declaration, the Court finds that the declaration is largely admissible. As pointed out by Bayer, Professor Lowe's report discloses the prior art references upon which he relies for his opinion that the '268 patent claims are invalid. In addition, he references himself as one of ordinary skill in the art of biosensors. It is not dispositive that Professor Lowe chose not to make in chart form an element by element comparison of the '268 patent claims with disclosures in the prior art references. The paragraph style of Professor Lowe's report references the elements of the '268 patent that he find read on the prior art disclosures. This is enough to put Roche on notice of Bayer's assertions.

The Court cannot agree, however, with Bayer's assertion that Roche was on notice that Bayer would assert the Nankai EPO patent as anticipatory prior art. Professor Lowe's report never clearly states that all of the elements of the '268 patent read on that prior art reference. He does state such in his declaration. Bayer argues that any failure of Professor Lowe's report in this regard should be cured because Bayer disclosed the Nankai EPO patent as a prior art reference it considered anticipatory in earlier materials among a laundry list of other references. Moreover, Bayer argues that Roche itself thought at one time that the Nankai EPO patent anticipated the '268 patent; therefore, there is no harm to Roche for Bayer's failure to disclose it in Professor Lowe's report. But, regardless of what Roche thought in the past about the validity of the '268 patent, in this litigation it is Bayer's burden to put forth evidence that each element of the '268 patent was anticipated in a single prior art reference. Professor Lowe's report, Bayer's admitted "direct" evidence on the issue, does not equivocally state that the Nankai EPO patent anticipates each element of the '268 patented invention. Roche was harmed in that it had no opportunity to assess this challenge before it filed its motion for summary judgment. Although it has had an opportunity to respond to Bayer's belated assertion in its briefs, Roche was denied the opportunity to assess the strength of its motion for summary judgment prior to filing the motion. The Court finds that some sanction is appropriate under the circumstances. Mindful that any sanction must be proportionate to the harm, *see Sherrod v. Lingle*, 223 F.3d 605, 612 (7th Cir.2000), the Court shall not consider on summary judgment those portions of Professor Lowe's declaration that opine that the Nankai EPO patent anticipates the '268 patented invention. If the anticipa-

tion defense survives Roche's motion, however, Professor Lowe's declaration shall be admissible at trial because Roche will have adequate opportunity to respond to the allegations of anticipation by the Nankai EPO patent before trial. Moreover, the Court shall consider the Nankai EPO patent reference in the obviousness analysis.

## 2. *Anticipation*

■ Bayer asserts that two abstracts by the inventors of the '268 patent anticipate the patent's claims. According to Bayer, one abstract, Joseph Jordan & Jonathan Talbot, Abstract, *Enzymatic Chronoamperometry*, Federation of Analytical Chemistry and Spectroscopy Societies 13th Annual Meeting, St. Louis, Missouri, September 28 October 3, 1986, (the "St. Louis abstract"), "describes a two-step process of enzymatic chronoamperometry, in which an enzyme catalyzed first reaction generates an electroactive species to virtual completion and a second electro-oxidation step quantitates the concentration of the electroactive species via a Cottrell current at a controlled potential." Lowe Rep. ¶ 55. The other abstract, Joseph Jordan & Jonathan Talbot, Abstract, *A New Microchemical Approach to Amperometric Analysis*, Eastern Analytical Symposium, New York, New York, October 20–24, 1986 (the "New York abstract"), "describes in general terms a virtually identical system." *Id.* Moreover, Bayer asserts that another report by inventor Jordan entitled *Novel Biomedical Sensors*, The Ben Franklin Partnership Program R & D Project, 1 September 1986–27 February 1987 (the "Ben Franklin report"), "describes the use of the Cottrell current procedure for biosensing purposes and the notion of allowing the enzymatic reaction to proceed 'virtually' to completion prior to the electrochemical analysis...." *Id.* Roche argues that Bayer has failed to show that any of the cited references written by the patent inventors disclose all of the '268 patent elements in their entirety.

### a. The Abstracts

With respect to the St. Louis abstract, Roche asserts that Professor Lowe admitted that the abstract did not disclose a buffer, an incubation period, a measurement cell containing an oxidant and a buffer, or automatic detection of the sample. Roche's Reply, at 7 (citing Lowe Dep. at 608–09). Furthermore, Roche avers that Professor Lowe testified that the New York abstract did not disclose a buffer, reconstituting the oxidant and buffer, or measurement of Cottrell current. *Id.* (citing Lowe Dep. at 605–09). With respect to the Ben Franklin report, Roche argues that Bayer has failed to establish that the report was made public before the '268 patent's parent application was filed. *Id.* at 9–10.

The Court finds that Bayer has not evidenced a material question of fact that the St. Louis abstract anticipates the claims of the '268 patent. As described in more detail above, a challenge to a patent's validity based on anticipation requires that "a prior art reference [ ] disclose every limitation of the claimed invention, either explicitly or inherently." *MEHL/Biophile Int'l*, 192 F.3d at 1365. *See also Hoover Group*, 66 F.3d at 302. With respect to the St. Louis abstract, Professor Lowe testified that the references do not say anything about a buffer as required by claim 1. Lowe Dep. at 608–09; *id.* at 605–06. He went on to state, "But one would expect, if it was an enzymatic reaction, that it would be conducted in the presence of a buffer." *Id.* at 609. Professor Lowe included this commentary in his claim construction charts attached to his declaration. Lowe Decl., Exh. 2, Lowe Claim Chart II, Talbott & Jordan Articles/Abstracts, at 2 (stating that "Jordan and Talbott also disclosed using a measuring cell with electrodes and containing an oxidant and an enzyme. As disclosed during

prosecution, anyone skilled in the art would have added a buffer because it was known that the enzyme required the presence of a buffer"). Roche argues that Professor Lowe's testimony improperly adds by extrinsic evidence a limitation to the prior art reference. Furthermore, Roche avers, Professor Lowe reported that the mere fact that one is using an enzymatic reaction does not mean a buffer is used. Lowe Rep. ¶¶ 38, 55 (asserting that Bayer's enzymatic reaction does not use a buffer). Therefore, Bayer cannot create an issue of fact by offering a conflicting affidavit on the invalidity question. Roche Reply, at 9 (citing *Russell v. Acme–Evans Co.*, 51 F.3d 64, 67 (7th Cir.1995)). Bayer argues that Professor Lowe's commentary merely explains what the St. Louis abstract teaches to one skilled in the art. Bayer Mem. in Opp'n, at 26–28 (citing, *inter alia, Ciba–Geigy Corp. v. Alza Corp.*, 864 F.Supp. 429, 436–37 (D.N.J. 1994), *aff'd in pertinent part,* 68 F.3d 487, 1995 WL 598380 (Fed.Cir.1995)). In other words, one skilled in the art of chronoamperometry would use a buffer in the enzymatic system describe in the St. Louis abstract.

The Court agrees with Roche that Bayer's attempt to use Professor Lowe's testimony and declaration about what one skilled in the art would learn from the disclosure is conclusory and impermissibly adds a limitation to the prior art disclosure. Conclusory statements about the existence of an element in a prior art reference are insufficient to create a question of fact. *See Moore U.S.A., Inc. v. Standard Register Co.*, 229 F.3d 1091, 1112 (Fed.Cir.2000) ("A party may not overcome a grant of summary judgment by merely offering conclusory statements.").

Professor Lowe's assertion that because the St. Louis abstract discusses an enzymatic reaction one skilled in the art would know it should contain a buffer has no factual support. In addition, neither Professor Lowe in his report nor Bayer in its briefs detail why a person of ordinary skill in the art at the time of the invention would find a buffer inherent in the teachings of the enzymatic reaction described by the St. Louis abstract.

Furthermore, Professor Lowe's assertion conflicts with his earlier report that Bayer's reaction strips, upon which an enzymatic reaction takes place, do not contain a buffer.[5] *See* Lowe Rep. ¶ 38. This leads the Court to conclude that Professor Lowe's opinion that the St. Louis abstract inherently teaches the use of a buffer because of the enzymatic reaction alone is hindsight rather than an opinion about what a person of ordinary skill in the art would recognize is necessarily practiced by the invention. *See Continental Can Co. v. Monsanto Co.*, 948 F.2d 1264, 1269 (Fed. Cir.1991) (stating that inherency describes something that is "necessarily present in the thing described in the reference"); *see also Rockwell Int'l Corp. v. SDL, Inc.*, 103 F.Supp.2d 1202, 1206–07 (N.D.Cal.2000) (discussing the differences between the view of inherency in *Continental Can* and that in *In re Graves*, 69 F.3d 1147, 1152 (Fed.Cir.1995)). Therefore, Bayer has not evidenced a genuine issue of material fact on whether the St. Louis abstract anticipates claim 1 of the '268 patent.

Professor Lowe also testified that the St. Louis abstract did not disclose the use of an open circuit as required by claim 12. Lowe Dep. at 609. However, his declaration states:

5. The Court notes that Professor Lowe's report at paragraph 38 implies that blood could buffer the reaction. But as Bayer asserts, and the Court agrees, the '268 patent's independent claim 1 requires that a buffer be present on the reagent strip before the blood is applied.

Talbott and Jordan teach applying the potential after the enzymatic reaction is complete.

The principle of "enzymatic chronoamperometry" involves the following methodological sequence.

I. CHEMICAL GENERATION OF AN ELECTROREACTIVE MOIETY, "Red," with the aid of an enzyme catalyzed reaction of the type $X + Ox = X' + Red$, which proceeds to virtual completion in $t_1$ sec. and where X denotes an oxidizable metabolite.

\* \* \* \* \* \*

This means that there is an open circuit. Lowe Decl., Exh. 2, Talbott & Jordan Articles/Abstracts, at 16. Without more explanation about why this passage indicates to one of ordinary skill in the art that there is an open circuit, the Court cannot find that Professor Lowe's declaration creates an issue of fact. This is particularly true in light of his earlier deposition testimony in which he states that the reference does not state there is an open circuit. *See Russell v. Acme–Evans Co.*, 51 F.3d 64, 67 (7th Cir.1995) (stating that where deposition testimony and a subsequent affidavit in opposition to a motion for summary judgment conflict, the affidavit should be disregarded). Therefore, Bayer has not evidence a material question of fact on whether the St. Louis abstract anticipates claim 12 of the '268 patent.

Bayer also asserts that the St. Louis abstract anticipates claims 43 and 47. Claim 43 requires that a potential automatically detect the presence of a blood sample. Claim 47 requires a timing sequence related to when the potential is applied. Professor Lowe testified that the St. Louis abstract does not say anything about whether there is a automatic detection of a sample or when the potential is applied. Lowe Dep. at 609–11. However, in his declaration, Professor Lowe opines that at the time of the St. Louis abstract, it was known in the art that timing of an amperometric reaction was important. Lowe Decl., Exh. 2, Talbott & Jordan Articles/Abstracts, at 33 & 45. Furthermore, Professor Lowe asserts that the '268 patent's reference to the fact that "fail-safe" methods were sought suggests to him

published automatic detection techniques that start a timing sequence once a sample is detected, such as those in U.S. Patent 4.935,105 and Japanese Laid Open Patent (Sho 62/1987–156553; filed 11 July 1987) in which current changes start the timing sequence. After the sequence is started, Talbott and Jordan disclose a two-step process in which the first enzymatic reaction goes to completion in an open circuit before the measuring potential is applied.

*Id.* Here, Professor Lowe is using language the inventors used in the patent specification to imply a limitation in the prior art reference. Professor Lowe points to nothing that connects his reference to the "fail-safe" language of the patent and the teaching of the other prior art reference to the intrinsic or inherent teachings of the St. Louis abstract. For this reason, the Court finds that Bayer is attempting to import a limitation (the use of a potential to detect a sample, or to initiate a particular timing sequence) into the St. Louis abstract from another prior art, which is impermissible for an anticipation analysis. *See Ciba–Geigy,* 68 F.3d 487, 1995 WL 598380, at \*2; *Studiengesellschaft Kohle, m.b.H. v. Dart Indus., Inc.,* 726 F.2d 724, 726–27 (Fed.Cir.1984). Therefore, the Court finds that Bayer has failed to evidence a material question of fact on whether the St. Louis abstract anticipates claims 43 and 47.

Bayer also argues that the New York abstract anticipates the claims of the '268 patent. Roche counters that the New

York abstract fails to disclose a buffer, reconstituting an oxidant and a buffer in the sample and measurement of Cottrell current. With respect to the Cottrell current element in particular, the Court agrees with Roche that the New York abstract fails to disclose this element. Professor Lowe's declaration refers to pages six and seven of the New York abstract for such a disclosure without further explanation. Lowe Decl., Exh. 2, Talbott & Jordan Articles/Abstracts, at 7. But, there is no page six or seven to this abstract, which is less than a single page. The Cottrell current element is found in all of the asserted independent claims. Therefore, the Court finds that Bayer has failed to evidence a material question of fact on whether the New York abstract anticipates the claims of the '268 patent.

### b. The Ben Franklin Report

Bayer asserts that the Ben Franklin report discloses each element of the '268 patent in its entirety. Roche argues that Bayer has failed to establish that this report was ever publically distributed as required by 35 U.S.C. § 102. Roche Mem. in Supp., at 13 (citing *Northern Telecom, Inc. v. Datapoint Corp.*, 908 F.2d 931, 938 (Fed.Cir.1990)). In addition, Roche argues that Bayer has not established that the business practice of the Ben Franklin Partnership at the time the report was written was to make these reports publically available. Roche Reply, at 10. Roche avers that Bayer's attempt to use an attorney's declaration about what he learned was the practice at Ben Franklin Partnership was not previously disclosed during discovery, is hearsay, and is not based on first-hand knowledge; therefore, the declaration and the information contained therein should be disregarded. *Id.*

Bayer argues that the foundation it has laid is sufficient. Professor Lowe testified that he did not know if the Ben Franklin report had ever been published. Lowe

Dep. at 613–14. Bayer, by declaration of its attorney, avers that this type of report is publically available from the Ben Franklin Partnership's center in State College, Pennsylvania. Jeffry Aff. ¶ 2. Bayer obtained two such reports dated September 30, 1985, and September 30, 1986, from the Ben Franklin Partnership that relate to the same invention. Bayer Compendium in Opp'n to Roche's Mot. for S.J., Exh. 9 ("Bayer Comp."). However, neither of these reports is the report that Bayer seeks to use in the instant litigation. *Compare id.* to Lowe Decl., Exh. G. Moreover, Bayer asserts that the Ben Franklin Partnership forwards copies of final reports to a state agency in Harrisburg, Pennsylvania, now known as the Pennsylvania Department of Community and Economic Development. Jeffry Decl. ¶ 3. The specific report that Bayer seeks to rely upon states the following on its cover:

THE BEN FRANKLIN
PARTNERSHIP
PROGRAM

RESEACH AND DEVELOPMENT
PROJECT MID–YEAR
REPORT

September 1, 1986–February 27, 1987

Novel Biomedical Sensors

Joseph Jordan, Professor of Chemistry

Project Director

Lowe Decl., Exh. G.

The Court finds that Bayer has failed to adequately provide a foundation for the exhibit attached to Professor Lowe's declaration. There is no indication on the exhibit itself where the document came from. In addition, the official reports from the Ben Franklin Partnership that accompany the Jeffry declaration do not carry the same title as this report, nor do they refer-

ence this report. Although the Court agrees with Bayer that it need not show that the Ben Franklin Partnership disseminated its "reports" to the public in order for the Jordan report at issue here to be a prior art publication as that term is defined by 35 U.S.C. § 102, it must lay a foundation for an inference that Exhibit G to Professor Lowe's declaration was actually available from the Ben Franklin Partnership prior to the '268 patent parent application date or sent to a state agency prior to the application date. Notwithstanding the problem with non-disclosure of the Jeffry declaration during discovery, the information contained therein does not cure the defects in Bayer's evidence of a foundation for the Ben Franklin report. In light of the uncertainties about the availability of the Ben Franklin report to the public at the time of the invention, the Court will not consider Bayer's arguments that the Ben Franklin report anticipates the '268 patent claims. *See Northern Telecom*, 908 F.2d at 938.

Bayer also argues that the content of the Ben Franklin report appeared in another journal in February 1988; therefore, the content of the Ben Franklin report in journal form is also prior art. To support this assertion, Bayer argues that the priority date for the '268 patented invention cannot be earlier than March 13, 1989, because the inventors failed to disclose the "best mode" for practicing the invention when they filed the first application in 1988. Specifically, Bayer points to the December 1987 testimony of Jonathan Talbott, in which he stated that he would have included a disclosure that used palladium for the electrodes instead of palladium design moreso. Bayer Comp., at 543–50.

Roche argues that Bayer's evidence is irrelevant to the priority date of the '268 patent because Talbott was not named as an inventor on the original 1988 patent and his opinion cannot change the filing date of the original invention. Roche Reply, at 17. The Court agrees with Roche; Bayer's argument that the priority date of the '268 patent is March 1989 is without merit. There is no evidence that the original patent application, as filed, would not have disclosed to one skilled in the art of electrochemical biosensors how to practice the invention. *See Nobelpharma AB v. Implant Innovations, Inc.*, 141 F.3d 1059, 1064 (Fed.Cir.1998) (stating that the two questions of a best-mode inquiry are "whether at the time the applicant filed an application for patent, he or she had a best mode of practicing the invention" and "whether the best most was disclosed in sufficient detail to allow a skilled artisan to practice it without undue experimentation") (citing *U.S. Gypsum Co. v. Nat'l Gypsum Co.*, 74 F.3d 1209, 1212 (Fed.Cir. 1996)). Moreover, at the claim construction phase of this suit, the Inverness parties argued about the breadth of the term electrode as it is used in the '268 patent. Inverness argued that the '268 patent required the reference electrode to be made of a certain material. But, the Court rejected the argument because the language of the patent did not specify a material for the electrodes. Order on Claim Constr., at 69–70. The Court finds that Bayer's attempt to change the priority date of the patent is without merit. Therefore, the Court will not consider the 1988 journal version of the Ben Franklin report as prior art.

The Court has found that the Ben Franklin report should not be considered as prior art for purposes of anticipation or obviousness arguments because Bayer has not laid a proper foundation for the earlier version of the report and the Court has rejected its arguments that the priority date of the '268 patent is March 1989.

#### c. Summary on Anticipation

For the foregoing reasons, the Court finds that Bayer has failed to evidence that

any of the prior art references it cites anticipate the claims of the '268 patent. Therefore, Roche's motion for summary judgment on Bayer's defense of anticipation should be **GRANTED.**

### 3. *Obviousness*

■ Roche has also moved for summary judgment on Bayer's defense of obviousness. Specifically, Roche argues that Bayer has failed to evidence a material question of fact on the issue of the level of ordinary skill in the art and the motivation or suggestion to combine the prior art references. Specifically, Roche argues that Professor Lowe, as an academic who studied biosensors and innovated in the field is not one of "ordinary" skill, but one of "cutting-edge" skill; therefore, his view of what was known or made obvious at the time of the invention is irrelevant. Further, Roche avers that Bayer's laundry list of prior art references without more cannot form the basis for a motivation or suggestion to combine the prior art. Improving biosensors, Roche asserts, is not enough of a motivation. Roche Reply, at 14–17 (citing, *inter alia, Ruiz,* 234 F.3d at 665; *In re Dembiczak,* 175 F.3d 994, 999 (Fed.Cir.1999), *abrogated on other grounds by In re Gartside,* 203 F.3d 1305 (Fed.Cir.2000); *In re Rouffet,* 149 F.3d 1350, 1357 (Fed.Cir.1998)).

Bayer asserts that the evidence suggests a question of fact on these issues. With respect to the level of ordinary skill in the art, Bayer argues that its interrogatory answers and Professor Lowe's declaration evidence the level of ordinary skill in the art. In its interrogatory answers, Bayer asserted a laundry list of prior art references and deposition testimony, then stated: "Bayer contends that the foregoing documents and testimony reflect the state of knowledge in the art which will be relevant to determining the validity of the patent-in-suit under 35 U.S.C. § 102." Bayer Comp., Exh. 4, Bayer Corp.'s Am.

Resp. & Obj. to Roche's First & Second Set of Interrogs., at 12. Moreover, Bayer described a person of ordinary skill in the art as follows:

> individuals who, by education or experience, are knowledgeable concerning chemical analytical methods, electrochemistry, chronoamperometry, enzymatic amperometry, use of current to quantitatively measure analytes and fluids, enzyme catalyzed reactions, diagnostic devices and/or testing of glucose or other analytes in body fluids. This [definition] is based on the patent-in-suit, which defines the subject matter at issue.

Roche App. Exh. 2, Bayer Corp.'s Am. Resps. and Objs. to Roche's First Set of Interrogs. to Bayer Corp., Mar. 2, 2001, at 6. Furthermore, Professor Lowe's declaration states:

> [A] person skilled in the art of biosensors was someone who, by education or experience, is [sic] knowledgeable concerning biosensors and the analytical methods used in biosensors. These methods include analyses based on color, current or other measurable features to quantify analytes. I believe the person skilled in the art was an academic involved in the study of biosensors or an individual employed by a company involved in the development and sale of biosensors.

Lowe Decl. ¶ 7.

With respect to the motivation to combine prior art elements, Bayer argues that the scope and content of the prior art is contested; therefore, a question of fact exists on what combinations of references would render the '268 patent claims obvious. In addition, Professor Lowe opines that it would be logical to alter the prior art disclosures, including the St. Louis and New York abstracts, and the Nankai EPO patent, to arrive at the claimed invention.

Bayer Mem. in Opp'n, at 29 (citing *B.F. Goodrich Co. v. Aircraft Braking Sys., Corp.*, 72 F.3d 1577, 1583 (Fed.Cir.1996)). In addition, Bayer asserts, Roche's admissions about its own assessment of validity of the '268 patent in the 1980s establish a question of fact on whether one skilled in the art at the time of the invention would be motivated to combine the cited references. *Id.* at 29–30 (citing, *inter alia, Nobelpharma AB v. Implant Innovations, Inc.*, 141 F.3d 1059, 1065 (Fed.Cir.1998)). Moreover, Bayer avers that multiple prior art references in the same field of endeavor used for the same purposes create an issue of fact on whether there was a suggestion or motivation to combine the prior art. *Id.* at 30–31 (citing, *inter alia, Riverwood Int'l Corp. v. Mead Corp.*, 212 F.3d 1365, 1367 (Fed.Cir.2000); *In re Gorman*, 933 F.2d 982, 987 (Fed.Cir.1991)).

The Court finds that Bayer has evidenced a material question of fact on whether the cited prior art would render the claims of the '268 patent obvious to one of ordinary skill in the art at the time of the invention. As discussed in more detail above, obviousness is a legal conclusion that is based on four underlying factual inquiries. *Ruiz*, 234 F.3d at 662; *WMS Gaming*, 184 F.3d at 1355. The factual inquiries for obviousness are: 1) the scope and content of the prior art; 2) the level of ordinary skill in the field of the invention; 3) the differences between the claimed invention and the prior art; and 4) any objective evidence of non-obviousness, such as long-felt need, commercial success, the failure of others, or evidence of copying. *See Ruiz*, 234 F.3d at 662–63; *WMS Gaming*, 184 F.3d at 1355; *C.R. Bard*, 157 F.3d at 1351. When a party bases its non-obviousness argument on two or more prior art references, there must be some suggestion or motivation to combine them. *WMS Gaming*, 184 F.3d at 1355. "The suggestion to combine may be found in explicit or implicit teachings within the references themselves, from the ordinary knowledge of those skilled in the art, or from the nature of the problem to be solved." *Id.*

The parties focus primarily on the level of ordinary skill in the art and the motivation to combine elements of the obviousness defense. Therefore, the Court will address only those elements. The Federal Circuit teaches that the factual inquiry into the level of ordinary skill in the art is informed by "the prior art references and the then-accepted wisdom in the field." *In re Dembiczak*, 175 F.3d at 999. In addition, factors that may be considered include "1) the types of problems encountered in the art; 2) the prior art solutions to those problems; 3) the rapidity with which innovations are made; 4) the sophistication of the technology; and 5) the educational level of active workers in the field." *Ruiz*, 234 F.3d at 666–67. In support of its view of the level of skill in the art, Bayer has offered its own definition, as defined by the field of the '268 patent, the background of its expert, Professor Lowe, and his assessment of the level of skill in the art in the 1980s, and some testimony of Roche scientists in the 1980s about their assessment of the '268 patent claims. Based on these evidentiary elements, the Court is unwilling to conclude as a matter of law that Bayer has failed to evidence the level of ordinary skill in the art. Roche opines that Professor Lowe would not be a person of ordinary skill because of his involvement with innovative research. However, his level of sophistication may merely reflect the sophistication of the technology and the education level of active workers in the field because many of Roche's own scientists, apparently many of them Ph.Ds, at the time of the invention understood some of the same things with respect to the '268 patent teachings. *See* Bayer Comp., at 99, 536. For these reasons, the Court finds that Bayer has evi-

denced a material question of fact on the level of ordinary skill in the art at the time of the invention.

Similarly, Bayer has evidenced a material question of fact on whether the prior art in combination would render the '268 patent claims obvious. The Court notes at the outset that the parties dispute the disclosures in the Nankai EPO patent. *See* Bayer Mem. in Opp'n, at 12–15. Therefore, there is a question of fact on a necessary finding to complete a comparison of the prior art with the elements of the patent.

Moreover, with respect to the buffer element of claim 1 specifically, the Court finds that Bayer has evidenced a question of fact on whether one of ordinary skill in the art would find that element obvious in light of the prior art. The motivation to combine may flow from the knowledge of one of ordinary skill in the art. *See Ruiz*, 234 F.3d at 666. Professor Lowe and at least one other scientist at the time of the invention testified that they would find the buffer element obvious because the St. Louis abstract, the New York abstract and the Nankai EPO patent disclose enzymatic reactions that go virtually to completion, which suggests the use of a buffer to one of ordinary skill in the art. *See* Lowe Decl. Exh. 2, Tabott & Jordan Abstracts/Articles, at 2; Bayer Comp. at 99, 536. In addition, Bayer argues that the Nankai EPO patent discloses a buffer and in combination with other references that disclose chronoamperometry methods for analyte concentration detection render claim 1 obvious. The Court finds that this is enough to survive summary judgment.

Bayer suggests the same is true for the element of an autostart feature. *See* Bayer Mem. in Opp'n, at 29–30 (citing Lowe Decl., Exh. 4, ¶ 61; Bayer Comp., at 413–14, 521–22, 531). Therefore, the suggestion to combine the Nankai EPO patent with U.S. Patent No. 4,935,105, for exam-

ple, arguably flows from the level of ordinary skill in the art. *See* Lowe Rep. ¶ 61.

Although not as well presented, Bayer has also evidenced a question of fact on whether the plethora of prior art references that address the improvement of biosensors suggest a motivation to combine them to form the '268 patented invention. Arguably, the disclosed prior art inventions sought to solve the same problems with the prior art: simpler biosensor test methods. *See* Lowe Decl. ¶ 23. Moreover, the elements of the '268 patent appear in various subcombinations in the devices discussed in the disclosed prior art. *See generally* Lowe Decl. Exhs. 1–3. Because those skilled in the art are presumed to have knowledge of references in the same field, the fact that many of Bayer's cited prior art references were in the same field of endeavor and were used for the same purpose supports and inference that one of ordinary skill in the art would be motivated to look at the numerous prior art solutions and combine them.

For these reasons, the Court finds that Bayer has evidenced a material question of fact on whether the claims of the '268 patent were rendered obvious by various prior art references, particularly the disclosures in the St. Louis abstract, the New York abstract and the Nankai EPO patent. Therefore, Roche's motion for summary judgment on the obviousness defense should be **DENIED.**

### IV. *CONCLUSION*

For the foregoing reasons, Bayer's motion for summary judgment on non-infringement is **DENIED.** Furthermore, Roche's motion for summary judgment on Bayer's defense of anticipation is **GRANTED,** however, Roche's motion for summary

judgment on Bayer's defense of obviousness is **DENIED.**